WILLIAM L. HARPER *et al.*

*v.*

DAVID J. ELY *et al.*

| 56 | 179 |
| 27a | 181 |
| 56 | 179 |
| 132 | 97 |
| 56 | 179 |
| 149 | 190 |
| 151 | 324 |
| 56 | 179 |
| 51a | 301 |
| 56 | 179 |
| 192 | 100 |
| 56 | 179 |
| 112a | 5308 |

1. STATE OF WAR — *sale under power in a mortgage — residence of the debtor within the States in rebellion — redemption.* The remedy of the holder of a mortgage in this State, to make sale of the mortgaged premises in case of default, under a power in the mortgage, was in no wise impaired or suspended during the existence of hostilities in the late war of the rebellion, on account of the residence of the mortgagor, and his grantee subsequent to the mortgage, within the rebellious States ; and this rule applies as well to the grantee of the mortgagor, who always resided within one of the States, which, after the conveyance to him, joined in the rebellion, as to the mortgagor himself, who, after making the mortgage, left his residence in one of the loyal States, for the purpose of engaging in hostilities against the government. So on bill filed to redeem from a sale had under such circumstances, the relief was denied.

2. MORTGAGE — *whether principal to become due on default of payment of interest.* A bond which was conditioned for the payment of a sum of money at a specified time, as principal, and interest thereon in semi-annual installments, until the principal should become due, contained the *proviso,* " that if default be made in the payment of any of the interest on the said principal sum as aforesaid, and any portion thereof shall remain due and unpaid for the space of thirty days after the same shall become due and payable, according to the above recital and condition, and in that case, the said principal sum, together with all arrearages of

interest thereon, shall, at the option of the said " creditor, " thereupon become due and payable, and may be demanded immediately." A mortgage given to secure this bond, provided : " But if default shall be made in the payment of the said sums of money above mentioned, or of the interest that may grow due thereon, or of any part thereof, at the time and times respectively when the same ought to be paid, as set forth in said condition," "that then and thenceforth it shall be lawful for the said party of the second part to enter into and upon all and singular the premises hereby conveyed," " and to sell and dispose of the same," after giving notice, etc. : *Held,* by a proper construction of the mortgage itself, a default in the payment of the interest matured the entire debt, and authorized the mortgagee to exercise the power of sale for the satisfaction thereof.

3.   But the bond and mortgage being executed on the same day should be taken as one instrument, and so construed, and so taking them, there could be no doubt that in default of payment of the interest the whole debt matured, and the power to sell was called into action.

4.   SAME — *of the option of the mortgagee to consider the entire debt matured.*   Where a mortgage provides that in case of default in the payment of any installment of interest the entire debt shall, at the option of the mortgagee, become due, it is not necessary that any particular form of expression should be used for the purpose of declaring such option. So where the deed, executed by the mortgagee, who sold under a power in the mortgage, recited that the mortgagee, " having elected to declare said mortgage due and payable, as by the said mortgage he was authorized to do, according to the terms and conditions thereof," he took possession, gave notice, etc., that was deemed sufficient.

5.   PUBLICATION OF NOTICE — *computation of time.*   In the computation of time, where an act is to be performed within a particular period, or on a particular day from and after a certain day, the rule is to exclude the day named and include the day on which the act is to be done.

6.   So where a notice of a sale was required to be published thirty days before the sale, and the first publication was on the 27th day of July, 1861, and the sale took place on the 27th day of August following, it was *held,* the thirty days' notice was properly given, that is, four days in July and twenty-six in August.

7.   PURCHASER — *trustee can not buy at his own sale.*   Where a mortgage confers a power of sale upon the mortgagee, and a third person becomes the purchaser at a sale under such power, at the request and for the benefit of the mortgagee, the sale will be set aside at the instance of the holder of the equity of redemption, as against such purchaser, or a subsequent purchaser with notice.

8. NOTICE — *what constitutes.* Whatever puts a party upon inquiry amounts, in judgment of law, to notice, provided the inquiry becomes a duty, as in the case of purchasers and creditors, and would lead to a knowledge of the facts by the exercise of ordinary diligence and understanding.

9. LACHES — *whether accounted for.* A sale of real estate was had, under a power in a mortgage, on the 27th day of August, 1861. A subsequent purchaser, not choosing to rely upon that sale, on the 17th of April, 1863, filed a bill for a strict foreclosure, and obtained a final decree on the 23d day of May, 1864. The mortgagor, and his grantee subsequent to the mortgage, were both non-residents at the time of the original sale, and so continued. On the 30th of November, 1866, the latter obtained an order setting aside the decree of strict foreclosure, and filed their answer in that suit, whereupon the complainant therein dismissed the same. In March, 1867, the defendant in the foreclosure suit entered a motion to set aside the order of dismissal, which was denied, and thereupon, they filed their bill to set aside the original sale under the mortgage; *held,* they were not guilty of *laches* in respect to the time of filing their bill.

APPEAL from the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

The opinion states the case.

Messrs. MOORE & CAULFIELD, for the appellants.

This is a suit in chancery, instituted by the appellants to set aside a sale made under a power claimed to have been given in a mortgage. The sale took place in August, 1861. The appellants contend that, inasmuch as the sale was had during the late war of the rebellion, and those who held the equity of redemption were residents of the States in rebellion, the sale was void, or voidable, at their option, citing *Hoare* v. *Allan,* 2 Dal. 102; *Hanger* v. *Abbott,* 5 Wall. 532; *Wm. Begley,* ib. 403; *The Reform,* 3 id. 628; *Semmes, Admr.,* v. *City Fire Ins. Co. of Hartford,* U. S. Cir. Court, dist. of Conn. (Chicago Legal News, Oct. 16, 1869); *Mrs. Alexander's Cotton,* 2 Wall. 404; *Thorington* v. *Smith et al.,* Legal News, Nov. 29, 1869; *Billgery* v. *Branch & Sons,* No. 6, vol. 8, Am.

Law Reg. 334; 6 ib. 220 and 732; *Leathers.* v. *Commercial Ins. Co.,* 2 Bush, (Ky.) 296; *Bell* v. *Louisville R. R. Co.,* 1 Bush, 404; *Griswold* v. *Waddington,* 16 Johns. 482; 3 Bos. & Pul. 191; *Tintudo* v. *Rogers,* 13 Vesey, Jr. 71; *Ex parte Bonsmaker,* 6 Am. Law Reg. 220, and cases there cited; *Tucker* v. *Watson; Jackson Ins. Co.* v. *Stuart,* 6 Am. Law Reg. 733; *Prize Cases,* 2 Black; Wheat. Inter. Law, §§ 305, 306, 307, 317 (see p. 297 and note 153, 8th ed.); Ed. Admir. 60; 23 Law, 335, 494; 3 Rob. Admir. 12; same Book, page 1; same Book — *The Vigilantia,* vol. 2, p. 255; same vol. — 3, p. 41; same vol. — 5, p. 297; 1 Wheat. 159; same vol. — 4, 105; 8 Cranch, 253; Vattel's Law of Nations, 321; 2 Gall. 295; *Exposito* v. *Bowden,* 7 Ell. and Blackb. 762; *Flint* v. *Waters,* 15 East, 260; *Bassick* v. *Buba,* 32 Eng. Law and Eq. 465; Kent, 65, 66, 67; *Scholfield* v. *Eichelberger,* 7 Peters (U. S.) 586; *Hughes* v. *Litssy et al.,* 5 Am. Law Reg. 148.

Messrs. KING, SCOTT & PAYSON, for the appellees, denied that the power of sale was in any wise suspended by reason of the mortgagor having gone within the rebel lines and become a resident of one of the States in rebellion, citing *Mixer* v. *Sibley,* 53 Ill. 61; *Dorsey* v. *Dorsey,* 30 Md. 522; *Buchanan* v. *Curvey,* 19 Johns. 137; 9 Wall. 75.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This is an appeal from the equity side of the circuit court of Cook county, to reverse a decree dismissing a bill filed by appellants praying to redeem certain premises therein described, from a sale under a mortgage executed by Benjamin F. Bradley, one of the complainants, to Benjamin F. Hadduck.

Appellants rely for a reversal of the decree upon three grounds: 1. That the sale by Hadduck under the mortgage of Bradley to him was made during the late war, and while Harper and Bradley were in the southern confederacy, and is void, or voidable, at complainants' option. 2. There was no

power expressed in the mortgage to sell the property for the whole debt, under the exercise of the holder's option to declare the whole debt due upon a default in the payment of interest, and that none can be implied. 3. That the sale by Hadduck to Heydock was a sham and a fraud, and that Ely had actual knowledge of the same, or of sufficient facts to put him on inquiry.

The first point we do not consider open for discussion in this court, it having been settled on the most mature and careful consideration, against appellants, in the case of *Mixer* v. *Sibley*, 53 Ill. 61, and in the case of *Willard* v. *Boggs, ante, p.* 163. The principles of the first named case have been recognized in the case of *Dorsey* v. *Dorsey*, 30 Md. 522, and by the supreme court of the United States in the case of *Ludlow* v. *Ramsay*, 11 Wall. 581. The position of Bradley, one of the appellants, is precisely like that of Ramsay, as he was the maker of the note and bound for its payment, and all the reasoning of the court applies with peculiar force to him. The difference is, that case was commenced by attachment, while here were no judicial proceedings, but a sale under a power claimed to have been conferred by the mortgage. Ramsay alleged in his bill that, at the time the attachment was sued out, and when the publication was made in the newspaper at Knoxville, Tennessee, notifying him to appear and defend the suit, or that judgment would be taken *pro confesso* against him, he was in no situation to see or know of such publication; that Tennessee was held by Federal troops, and he was in the country held by the confederate forces, and no newspapers published in the Federal lines were permitted in the confederate lines, and there were no mail facilities existing between them; that a great civil war was raging between these governments; and that martial law existed in the State of Tennessee, civil courts being only held by the will of military commanders. He also alleged that when the attachment was issued and the proceedings had under it, he was known to be one of the enemy of the party governing by arms, the locality of the court.

184 HARPER *et al. v.* ELY *et al.* [Sept. T.,

Opinion of the Court.

Ramsay, in his bill, stated he left Knoxville a short time before the arrival of the Federal troops, and took up his residence in one of the States of the confederacy.

The questions asked in that case, may be asked in this, so far as Bradley is concerned,— why was he in the States of the confederacy, his residence being in Kentucky? Why could he not return to Chicago, his former residence? Why could he not have communication with that place, or with his friends in Kentucky, the State of his residence? Why did he leave Kentucky? Was it enforced? and was his return forbidden? Was not his absence voluntary? He could have returned from Virginia under the president's proclamation of December 8, 1863, removing all obstacles to his return. He left the State of his residence for the purpose of engaging in hostilities against it, and must be liable to all the legal consequences flowing therefrom.

But Bradley, before entering the service of the confederacy, and before hostilities had broken out, and before a single State had attempted to secede, had sold and conveyed this property to his co-complainant, Harper, who was, at the date of the conveyance, 10th of January, 1860, a citizen of one of the seceding States, and has always resided there, and might, with some plausibility, urge this fact. as ground of relief; yet, in *Willard* v. *Boggs, supra,* that fact was not considered sufficiently potential to take away the power of the mortgagee to sell the property. We do not appreciate the force of appellants' argument that, when Hadduck exercised the power to sell, if such power was given by the mortgage, the donor of the power could not himself sell the property by reason of his residence in a rebellious State. What should have prevented Bradley from conveying his interest in this property, during the existence of hostilities, had he possessed any to convey, we do not understand. The cases cited by appellants, on this point, do not so hold. Nor was Harper prevented from conveying the fee by reason of hostilities. The right of the United States to confiscate the property could not be

defeated, but Harper's right would pass to his grantee, subject to any right of confiscation by the Federal government, should the authorities of that government choose to exercise such right. It can hardly be said, that money paid by a citizen of a seceding State, to his creditor, a citizen of an adhering State, during hostilities, can be recovered back on a cessation of hostilities. It has never been conceded by the United States, to the citizens in arms against the government, the character of alien enemies, but that of belligerents only. *Shortridge* v. *Macon,* per Ch. J. CHASE, in 1867; cited by appellees' counsel. Harper's rights, on this point, are disposed of by the case of *Willard* v. *Boggs, supra,* and we desire to add nothing to what is there said.

The second point is, that the mortgage executed by Bradley and wife to Hadduck, of 21st September, 1859, to secure the sum of $13,000, and interest at stated times, under which the sale was made to Heydock, contains no power to sell the property for the whole debt, under the exercise of the holder's option to declare the whole debt due upon a default in the payment of interest — that there is no express power in that deed, and none can be implied.

A reference to the deed itself must determine this point.

It appears from the record, that the bonds were executed by Bradley to Hadduck, one in the penalty of $16,000, to secure the notes of $8,000 principal, and ten other notes of $200 each, being interest notes, and payable to James McQuestion and William C. Thompson, which notes Hadduck signed as security of Bradley, and to secure the payment thereof Bradley, on the same day, September 28, 1859, together with his wife, executed a deed of trust to Edward H. Hadduck on the premises in controversy. ·

Being indebted to Benjamin F. Hadduck in the sum of $13,000 for money loaned, Bradley, on the same day, made and delivered to Hadduck a bond in the penalty of $20,000, conditioned for the payment of the said sum of $13,000 within seven years from the 1st day of December, 1859, with ten per

186 HARPER *et al. v.* ELY *et al.* [Sept. T.,

Opinion of the Court.

centum per annum interest thereon, to be computed from the 1st day of June, 1860, and payable semi-annually on the 1st day of June and December of each year, according to thirteen interest notes or coupons attached to the bond, for the sum of $650 each, excepting the one maturing on the 1st day of December, 1866, which was for the sum of $758.33.

This bond contained this *proviso,* "that if default be made in the payment of any of the interest on the said principal sum as aforesaid, and any portion thereof shall remain due and unpaid for the space of thirty days after the same shall become due and payable according to the above recital and condition; and in that case, the said principal sum, together with all arrearages of interest thereon, shall, at the option of the said Benjamin F. Hadduck, his executors, administrators or assigns, thereupon become due and payable, and may be demanded immediately, or at any time within thirty days after any such default."

To secure the payment of this last mentioned bond, and the coupons thereto attached, and to secure the performance of the covenants contained in the bond for $16,000, the mortgage in question was executed.

In the above mentioned bond it is conditioned, if default be made in the payment of any of the interest on the principal sum, and any portion thereof shall remain due and unpaid for the space of sixty days after the same shall become due and payable, in that case, the principal sum, together with all arrearages of interest thereon shall, at the option of Hadduck, his executors, etc., thereupon become due and payable, and may be demanded immediately, or at any time within thirty days after any such default. The default here provided for is in the payment of interest, and the penalty therefor is, that the principal sum, together with all arrearages of interest, at the option of Hadduck, shall become due and payable, and may be demanded immediately.

Now what is the provision in the mortgage? As plain as language can express an idea, it provides that Hadduck may

sell and dispose of the premises, and all benefit and equity of redemption of Bradley, in case default be made in the payment of the said sums of money mentioned in the mortgage, or of the interest that may become due thereon, or of any part thereof, at the time and times respectively when the same ought to be paid as set forth in the condition. Nothing is said in the mortgage about declaring an option by Hadduck, but, by the terms of the mortgage, a default in the payment of the interest matured the debt, and authorized the mortgagee to enter upon and sell the premises in satisfaction thereof. The provision in the mortgage is as follows :

"But if default shall be made in the payment of the said sums of money above mentioned, or of the interest that may grow due thereon, or of any part thereof, at the time and times respectively when the same ought to be paid, as set forth in said condition ; or if said party of the first part shall suffer or permit said premises, or any part thereof, to be sold for taxes, or do or permit any thing to be done upon said premises, or any part thereof, that shall impair or injure the value thereof, or tend to impair or weaken the security intended to be hereby effected, or shall neglect, refuse or fail to keep the buildings upon said premises, or any part thereof, fully insured, and the policy or policies duly assigned and delivered to the said party of the second part, his executors, administrators or assigns, that then and thenceforth it shall be lawful for the said party of the second part, his certain attorney, executors, administrators or assigns, to enter into and upon all and singular the premises hereby conveyed, or intended to be, and each and every tract thereof, and the same from henceforth peaceably and quietly to have, hold and enjoy the rents, issues and profits thereof; to receive and take to his or their own use and benefit, without any hindrance, eviction or interruption whatsoever, and to sell and dispose of the same, either by himself, themselves, or by his or their attorney for that purpose constituted, and also of all benefit and equity of redemption of the said party of the first part, his heirs or assigns therein, at

188                HARPER *et al. v.* ELY *et al.*                [Sept. T.,

Opinion of the Court.

public vendue, after having first given thirty days' notice of the time and place of such sale (the sale to be made in the city of Chicago), by advertisement in any one of the daily newspapers that may at that time be published in the city of Chicago, personal notice to the said party of the first part, his heirs, executors, administrators or assigns, of the said sale, being hereby expressly waived ; and as the attorney of the said party of the first part, for that purpose by these presents duly authorized, constituted and appointed, to make and deliver to the purchaser or purchasers thereof, a good and sufficient deed or deeds of conveyance in the law for the same, in fee simple; which said deed shall be *prima facie* evidence of the full and complete performance of the advertisement, notice and other requirements of said sale under this mortgage; and out of the money arising from such sale to retain the principal and interest, which shall then be due on the said bond, and also all taxes and redemption money paid by the said party of the second part, for the redemption from tax sale of said premises, or any part thereof, together with the costs and charges of advertisement and sale of said premises, rendering the overplus of the purchase money (if any there shall be), unto the said Benjamin F. Bradley, his heirs, executors, administrators or assigns, which sale, so to be made, shall forever be a perpetual bar, both in law and equity, against the said party of the first part, his heirs and assigns, and all other persons claiming or to claim the premises, or any part thereof, by, from or under them or any of them. But if the amount realized from said sale, after paying all costs, charges and expenses, including attorney fees, and all sums of money advanced on account of said property, shall not be sufficient to fully pay said bonds hereinbefore mentioned, and the interest due at the time of said sale, then to apply the amount so received, over and above costs and charges, first in payment of the interest then due, and to indorse the balance as so much paid on said bonds, given for said principal sum."

But this bond and mortgage, being executed on the same day,

should be taken as one instrument, and so construed, and so taking them, there can be no doubt, that in default of payment of the interest the whole debt matured and the power to sell was called into action.

It is further objected, that Hadduck did not declare his option prior to the sale. It is not necessary that any particular form of expression should be used for such purpose. In the record (exhibit D) it is recited, among other things, as follows : " and the said Hadduck having elected to declare said mortgage due and payable, as by the said mortgage he was authorized to do according to the terms and conditions thereof, and having entered in and upon said mortgaged premises, and taken possession thereof, the said premises were, by the said Hadduck, duly advertised for public sale at the north door of the court-house in the city of Chicago, etc., on the 27th day of August, 1861, in the Chicago Post, a daily newspaper, etc.

Then follows the notice given in the Post.

And here, while on this branch of the case, we may dispose of the objection to this notice, that it was not published thirty days before the sale. The first publication was on the 27th day of July, 1861, and the sale took place on the 27th day of August following. In the computation of time, as to such notices, the rule is, when an act is to be performed within a particular period, or on a particular day, from and after a certain day, to exclude the day named and include the day on which the act is to be done. *Ewing* v. *Bailey*, 2 Scam. 420 ; *Hall* v. *Jones*, 28 Ill. 55. Or more concisely stated, it is to count one day in and the other out. Counting in the 27th July as one day, it being the day on which the first publication was made, and leaving out the 27th day of August, the day of the sale, there remains full thirty days, namely : four days in July, and twenty-six in August. This is the rule in publications of sixty days' notice in attachment suits. *Vairin* v. *Edmonson*, 5 Gilm. 270.

We come now to the third and last point raised by appel

lants, and that is, the sale by Hadduck to Heydock was a sham and a fraud, and that appellee Ely had actual knowledge of the same, or of sufficient facts to put him on inquiry.

On this point we are decidedly with the appellants. We do not believe any unprejudiced and right-minded man can read the testimony of Heydock, Honore, Hadduck and Ely, found in this record, without a deep conviction, that the sale of this property, under the circumstances, and in the manner in which it was consummated, was gotten up and carried on for the express benefit of B. F. Hadduck, to whom Bradley, in the confidence of friendship, had intrusted the management of this estate during the absence of the owner, he having every reason to believe it would receive the same care and attention Hadduck bestowed upon his own property. Hadduck himself says, he was to manage and control it as if it was his own, meaning thereby, " to manage it as carefully as if it was his own," to pay for repairs and taxes, and apply the net proceeds of the rents to the payment of interest.

We have read the testimony with great care, and will comment on such portions of it as tend to establish the important and controlling fact that the sale was made by Hadduck and the property purchased in for his own benefit.

This property was committed to the care and control of Hadduck, its owner being a non-resident, with the reasonable expectation, nay with the express understanding, that he would make as much profit out of it for the benefit of the owner as he would were it his own, and it was expected he would be ready, at all times, to render a true account of his stewardship. There were six new buildings on the Clark street front, arranged for stores, with dwellings above. They were on one of the greatest thoroughfares of a great and growing city, and not far removed from its business center. A faithful agent would have used the ordinary means at hand to have them occupied, the owner would, certainly, if he had no agent, yet we do not see that Hadduck advertised the buildings for rent, or devoted the front on Griswold street to any profitable purpose. An owner

of property so valuable would not so act. The question natural-
ly arises here, what motive could Hadduck have to neglect
this, why should he not desire the property should be brought
up to its greatest limit of production? The answer is obvious.
Hadduck well knew that the rents of this property was Brad-
ley's sole reliance for the discharge of the mortgage, or at least
the interest upon the notes as they became due, the principal not
being due and payable for seven years. As the bond and
mortgage provided for the maturity of the whole debt, in de-
fault of the payment of interest, and as the property was favor-
ably situated and would in all probability greatly increase in
value, being then at a low point of depression, how natural
was it for a speculator in real estate, as Hadduck is shown to
have been, to endeavor to produce a state of affairs which would
call into action his power of sale, and through that, possess him-
self of the property at figures much below its real value. The
absent owner could have had no other thought, but that the
rents were keeping down the interest on the debt, paying the
taxes and repairs, that the "trusty friend" to whom was com-
mitted the property, would see to that, taking the same care of
it he would "of his own." The control of this property was
committed to Hadduck in 1860. He sold it in August, 1861, for
default in payment of the interest note due June 1st, of that
year, and through his nephew Heydock, whom he procured to
bid off the property at a price agreed upon between them, he
became the owner, thus accomplishing a purpose, all the facts in
the case persuade us to believe, he intended to accomplish when
the control of the property was committed to him. It was not
money he wanted, for none was paid or to be paid on the sale.
No one can read the testimony of Doctor Heydock, without
being convinced, that he was a mere instrument in the hands
of his uncle to do a wrong, unwittingly no doubt, on his
part, which would rob an absent owner of his property, he
relying in perfect security on the fidelity of a "trusty friend."
Dr. Heydock testifies that Hadduck came into his office and
asked him to go to the court house and bid off this property;

he did so within ten minutes of the time, or it might have been an hour, when he first learned the property was to be sold; he went over alone and bid it off at about $5,000, the sum Hadduck advised him to bid. He states he did not examine into the title to the property before bidding, nor the property itself, nor did he then know there were improvements on it, nor did he know the width or depth of the lot. He does not know what the property rented for after he bid it off; he did not take possession of it, nor did he receive, directly, any rents from it. He did not have the property insured, nor does he know that the deed for it was ever in his possession, nor does he know if the deed was recorded or not. He distinctly admits, that while the title was in him by this sale, he would not have felt authorized to sell it at his own price and of his own motion; it was all the time subject to the control of Hadduck. In speaking of the sale to Ely, he says he does not know what Ely paid for it, nor what was the consideration, and never knew; that the purchase money from Ely did not come to him; that he did not make any deed to Ely, but signed any paper presented to him by Hadduck. His cross-examination puts no different phase on the transaction, and the conclusion is irresistible, that Dr. Heydock bid off the property for the benefit of Hadduck.

The testimony of Hadduck does not alter the character of this transaction. He says, before the day of sale, perhaps a week or three or four days, he told Heydock about it and advised him to buy it, and at the day of sale he did buy it for $5,000, and "supposes" he bought it for himself, "legally he did." Heydock says it was within ten minutes or an hour after he learned of the sale that he went to the court house and bid off the property. Hadduck further says, after "legally" buying the property, he had "the legal right" to dispose of it at his pleasure, but not the absolute right; evidently meaning that Heydock was under a moral obligation, growing out of some secret understanding between them, not to exercise absolute control over it, and this Heydock admits when he

testified that the property was all the time subject to the control of Hadduck.

In selling to Ely, Hadduck says he conveyed the impression to him that the sale to Heydock was *bona fide.* He told Ely he was owing Heydock and his bid was applied on that indebtedness. This indebtedness had existed for a long time prior to the purchase, and was originally a debt due to the wife of Dr. Heydock, for which Hadduck had been in the habit of giving Dr. Heydock various kinds of security, and which Hadduck always controlled — he could always get them changed or released as he desired.

This fact goes further to show, Dr. Heydock was a mere instrument of Hadduck, and this indebtedness a very convenient circumstance. To show still more clearly that the purchase by Heydock was for the benefit of Hadduck, we have only to consider the testimony in regard to the control of the property by Hadduck after the sale. For six months the property was insured in Hadduck's name, up to the time of the sale to Ely, and to him the policies were "passed over." The leases also were to Hadduck as lessor, and which he assigned to Ely. Hadduck introduced Ely's agent to the tenants, and instructed them to pay the rent to him thereafter.

Hadduck had not "passed over" or assigned the policies to Heydock, nor the leases, and he remained in possession of the property, collecting the rents and managing it as he had done, giving receipts in his own name, in short, exercising all those acts of ownership and control he had exercised before the sale to Heydock. That the purchase made by Heydock was for the benefit of Hadduck there remains not the shadow of a doubt. The testimony shows it most conclusively, and all the authorities are uniform that such a sale will be set aside in a court of equity. *Pensonneau* v. *Bleakley,* 14 Ill. 15; *Robbins* v. *Butler,* 24 id. 387; *Lockwood* v. *Mills,* 39 id. 603; *Miles* v. *Wheeler,* 43 id. 123.

As between Heydock and Hadduck this sale was invalid, but it is claimed Ely was an innocent purchaser, without notice of

any infirmity in the sale and cannot·be affected. This is the only remaining point on this branch of the case. Was Ely an innocent purchaser without notice?

The generally received doctrine upon the subject of notice is, that whatever puts a party upon inquiry amounts, in judgment of law, to notice, provided the inquiry becomes a duty, as in the case of purchasers and creditors, and would lead to the knowledge of the facts, by the exercise of ordinary diligence and understanding. 4 Kent's Com. 179. Under this rule it follows, that each case, as it arises, must be governed by its own peculiar circumstances, and, as was said in *Doyle et al.* v. *Teas et al.*, 4 Scam. 202, when the court is satisfied that the subsequent purchaser acted in bad faith, and that he either had actual notice, or might have had that notice, had he not wilfully or negligently shut his eyes against those lights which, with proper observation, would have led him to knowledge, he must suffer the consequences of his ignorance, and be held to have had notice, so as to taint the purchase with fraud in law. It is sufficient if the channels which would have led him to the truth were open before him, and his attention so directed that they would have been seen by a man of ordinary prudence and caution, if he was liable to suffer the consequences of his ignorance. P. 250.

The fact of which it is alleged Ely had knowledge, or might have had, is the sale to Heydock as having been in truth and intention, a sale and purchase by him for the benefit of Hadduck. At the time Ely purchased, were there any circumstances of a suspicious character hanging about the transaction that should have put a prudent and cautious man on his guard and stimulated inquiry?

We think there were. In the first place, Ely knew Doctor Heydock was the ostensible purchaser at the sale. He knew it was a trust sale, in conducting which the utmost fidelity is demanded. He knew that at such a sale it was unlawful for the trustee ʻto become the purchaser, directly or indirectly. He knew from Hadduck's acts and conduct in negotiating the

sale to Ely that he was doing it as one controlling the title. He knew the property was insured in Hadduck's name and leases taken in his name, all which were assigned or passed over to Ely. He caused the tenants to attorn to Ely. When told by Hadduck that the consideration paid by Heydock was a credit on Hadduck's indebtedness to Heydock's wife, why did not Ely inquire of Heydock into the truth of this statement and the accompanying circumstances? Had he done so, he would have been informed by Heydock that he bid for the property at the instigation of Hadduck, and at the sum advised by Hadduck, and that he did not consider himself the absolute owner of the title, but held it subject to the demand of Hadduck. All this Ely must be charged with knowing, for the reason that, upon inquiry, the channel being open to him, he might have known, and knowing them, he cannot claim to be an innocent purchaser, without notice of the invalidity of the sale to Heydock. *Rupert* v. *Mark*, 15 Ill. 542; *Ogden* v. *Haven*, 24 id. 57. But there are other circumstances going to show Ely did not purchase on the faith of this sale to Heydock; else why should he make objection to the title or to the receipt of a deed from Heydock, and why require Hadduck to procure a quit-claim deed from Harper? If he had confidence in Heydock's title is it reasonable he should require a guaranty from Hadduck, and is it not strange, if he had this confidence, he should soon after have recognised the subsisting validity of the mortgage and have taken all the necessary steps to its strict foreclosure, actually obtaining a decree to that effect, on a constructive notice to appellants, then and still non-residents? It is incredible that a person having confidence in a title, acquired by purchase, as this was, should incur the trouble and delay of an expensive chancery proceeding, though the expenses were to be paid by Hadduck. And this very fact that Hadduck agreed to pay those expenses on failing to procure a quit-claim deed from Harper, admonished Ely there was something wrong in the transaction which it was his duty to investigate before he paid his money. The

sale was negotiated by Honore, a real estate agent, he knowing no other persons in the transaction but Hadduck and Ely, and Ely himself having at no time any communication with Heydock upon the subject. Hadduck was the real owner, Heydock holding the legal title in secret trust for Hadduck, all which Ely had the means of knowing. From the facts in the record, all of which we cannot comment upon, nor is it necessary, we are forced to the conclusion that the sale to Heydock was for Hadduck's benefit, and from the circumstances given in evidence Ely was bound to know it, and knowing it, he is in no better position than Hadduck, as to whom the sale was invalid and ought to be set aside.

As the purchase was made by Ely for the joint benefit of himself and his brother, Z. S. Ely, to whom D. J. Ely has conveyed an undivided half of the property, he must be deemed in equity as equally affected by the notice D. J. Ely had, and, moreover, it is not shown Z. S. Ely paid any money.

There remains but one other point to consider, and that is, the claim of appellees that appellants have too long delayed the assertion of their rights, if any they have; that they are guilty of *laches*, and ought therefore to find no favor in a court of equity.

It is urged by appellees that complainants suffered more than five years to elapse after the sale to Heydock before any assertion by them of their rights.

This is satisfactorily answered by the facts in the case. Complainants were non-residents and had no knowledge of the sale and of appellees' participation in it, until a short time before filing their bill. *Laches* cannot be imputed if they proceeded to act so soon as they discovered the facts.

Ely virtually disclaiming to hold under the sale to Heydock by filing a bill for a strict foreclosure on the 17th of April, 1863, cannot go behind that date to fix the charge of *laches*, for by that bill the existence of the mortgage, as in full life and vigor, was admitted, and there was nothing for complainants to do but to await the decision of that case. The final decree

in that suit was entered May 23, 1864.   They being non-residents had, under the statute, three years to come in and ask to have the decree set aside that they might·put in their answer.   This they did, the court granting their motion the 30th of November, 1866, when their answer was filed, whereupon the suit was dismissed by Ely.   In March, 1867, appellants entered their motion to set aside the order dismissing the suit, which motion being denied, they thereupon filed this bill. There was no use for appellants to take any step while Ely's bill for a strict foreclosure was pending, for in that suit appellants could have asserted their equities, and it was only on its dismissal they were free to act.   We see no ground for imputing *laches* in the case.   The equity of the case is with complainants, and the decree of the circuit court must be reversed, and the cause remanded for further proceedings consistent with this opinion.

*Decree reversed.*