(No. 10993.—Reversed and remanded.)

THE GERMAN-AMERICAN NATIONAL BANK OF LINCOLN
et al. Appellees, vs. JOHN B. MARTIN et al. Appellants.

*Opinion filed February 21, 1917—Rehearing denied April 18, 1917.*

1. DEEDS—*the question of delivery is primarily one of intention.* No particular form or ceremony is required to constitute a good delivery of a deed, and it is sufficient if the intention of the grantor that the deed is to become operative immediately and that he has surrendered all control over it is clearly manifested.

2. SAME—*when delivery of deed to third party to be given to grantee at grantor's death is a valid delivery.* Where a grantor executes a deed and places it in the hands of a third party, to be delivered unconditionally to the grantee upon the death of the grantor, and the grantor surrenders all control over the deed, there is a valid delivery, and the conveyance is not open to the objection that it is in the nature of a testamentary disposition and void because not executed with the formality required by statute.

3. SAME—*deed to be delivered at the grantor's death takes effect immediately, if such intention is manifested.* A deed handed to a third party for delivery to the grantee at the grantor's death takes effect not at the death of the grantor but immediately, if such act is attended with circumstances clearly evincing such intention on the part of the grantor, and the reservation of a life estate in the grantor raises a presumption of such intention.

4. SAME—*when bank holding deed for delivery is agent of the grantee.* Where a grantor delivers a deed to a bank to be delivered at his death to the grantee, with circumstances indicating an intention that the deed take effect immediately, the bank holds the deed as agent of the grantee.

5. SAME—*when deeds will not be held to have been made to defraud existing creditors.* Where a father makes deeds to each of his children, reserving a life estate in himself, and retains for himself sufficient property to cover his personal liabilities, and where the joint estates of himself and his sons, with whom he is jointly liable, are then sufficient to cover such joint liability, the deeds will not be held to have been made for the purpose of defrauding existing creditors.

6. SAME—*Conveyances act places subsequent creditors on same footing as subsequent purchasers as regards notice.* Section 30 of the Conveyances act places subsequent creditors on the same footing as subsequent purchasers in regard to notice of existing

deeds, and the question of fraud as to subsequent creditors must be determined by the question whether a subsequent purchaser would have been charged with notice under.the same circumstances.

7. SAME—*actual occupation of land is notice equal to record of deed.* The actual occupation of land is notice equal to the record of the deed or other instrument under which the occupant claims, and a purchaser cannot excuse himself by merely obtaining information as to how the possession was originally obtained, but is bound to inquire of the person in possession by what tenure he holds and what interest he claims, open possession being sufficient to charge such purchaser with notice of all legal and equitable claims of the occupant.

8. SAME—*notice which puts an ordinarily prudent person upon inquiry is sufficient to bind a subsequent purchaser.* Whatever circumstance is sufficient to put an ordinarily prudent person upon inquiry which would lead to the truth is in all respects equal to and must be regarded as such notice of a former conveyance as will bind a subsequent purchaser.

9. SAME—*when bank holding deeds in escrow is put upon inquiry as to their contents.* Where a grantor deposits deeds with a bank in an envelope, on the outside of which is written a statement that the deeds are placed in escrow with the bank and directing the bank to keep the deeds safely until the grantor's death and then deliver them to the several grantees named therein, if living, or to the remainder-men if any of the grantees are dead, and the bank accepts the deeds after the cashier has been advised that the deeds are not to be withdrawn and has indorsed on the envelope the words "cannot be withdrawn," the bank is put upon inquiry as to the contents of the deeds in its subsequent dealings involving the credit of the grantor and is charged with notice of what such inquiry would have revealed.

CARTWRIGHT, CARTER and DUNN, JJ., dissenting.

APPEAL from the Circuit Court of Logan county; the Hon. SAIN WELTY, Judge, presiding.

KING & MILLER, (URI KISSINGER, FRED I. EDGELL, and DAVID H. HARTS, JR., guardians *ad litem*,) for appellants.

COVEY & WOODS, McCORMICK & MURPHY, C. E. SMITH, A. D. CADWALLADER, EVAN WORTH, and BEACH & TRAPP, for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

This is an appeal prosecuted by John B. Martin, John J. Martin, Lillie E. Russell, Violet B. Malerich, Isa Marie Wigginton and Marian D. Martin, and certain infants by their guardians *ad litem,* from a decree of the circuit court of Logan county setting aside, as against the German-American National Bank of Lincoln, Illinois, and certain other judgment creditors of John B. Martin, voluntary deeds made by John B. Martin to his children and their descendants.

John B. Martin, a widower, is the father of seven children, viz., Zachariah, John J., George, Lillie E., Isa Marie, Violet B. and Marian D. On April 26, 1912, and for several years prior thereto, he was the owner in fee simple of about 874 acres of land in Logan county, Illinois. He was then sixty-five years of age, had retired from active farming, and was living in the residence on a portion of his lands which he called the home place, with his four daughters and his son George, all of whom were then unmarried. The other two sons, Zachariah and John J., were married and each was farming a portion of the lands owned by their father, as his tenants. The remainder of the lands, including the home place, was farmed by his son George, as his tenant. Some time prior to April 26, 1912, John B. Martin determined to divide his lands among his children, and with that end in view requested his children to meet with him at his residence. The two sons Zachariah and George failed to attend the meeting. The other children were present, and John B. Martin, who could neither read nor write except to sign his name and recognize his signature, designated the particular tract or tracts which he desired to give to each of his children, and at his request John J. Martin made out a list of the lands to be given to each child. In the contemplated division each child was to receive 80 acres of good farming land, worth approximately $250 per acre, and 40 acres of less valuable timber land. After this meet-

ing, and on April 26, 1912, John B. Martin, in company with his son John J., went to Lincoln, which is about five miles east of the residence of John B. Martin, and called upon an attorney, who, under the direction of John B. Martin and in accordance with the memoranda made by John J. Martin, prepared seven deeds, which John B. Martin thereafter, on May 3, 1912, signed and acknowledged before a notary public in the office of the attorney. All of these deeds were in form the same. Each, after reserving to the grantor a life estate, purported to convey to one of the children of John B. Martin for life and the remainder in fee to certain remainder-men therein specified, 120 acres of the land owned by John B. Martin, the conveyances being in accordance with the division of his lands theretofore announced by John B. Martin at the meeting with his children and in accordance with certain promises theretofore made by him to certain of his children, as hereinafter more particularly set forth. The deed to Marian D. Martin contained the following provisions:

"To have and to hold for the period of the natural life of said Marian D. Martin, and with remainder after the death of the said Marian D. Martin to the lineal descendant or descendants of said Marian D. Martin surviving her, *per stirpes,* in fee. If the said Marian D. Martin leaves no lineal descendants her surviving, then the remainder in said real estate shall vest in such one or ones of the lineal descendants of grantor as said Marian D. Martin may by will or deed appoint. In default of all lineal descendants of said Marian D. Martin her surviving, and in default of appointment by her, as aforesaid, said remainder after the death of the said Marian D. Martin shall vest in all the lineal descendants of the said grantor *per stirpes,* in fee. This deed is one of a series of deeds by means of which grantor disposes of his land to his children, reserving a life estate in all of said real estate. * * * Said Marian D. Martin shall occupy said land as a tenant during the life of grantor, rendering to grantor, yearly, a rent of $400 per annum, pay-

able on the last day of each year. Grantee, Marian D. Martin, shall pay the taxes on said land each year and retain the amount so paid out of the sum of $400 rent."

The deed to each of the other daughters contained the same provisions, with the exception that the name of the grantee in the deed was substituted wherever the name of Marian D. Martin appears in the provisions above quoted. The deed to each of the sons also contained the same provisions, substituting the name of the grantee wherever the name Marian D. Martin appears in the provisions above quoted, with the exception that after the termination of the life estate of the son, remainder was given to his widow for the period of her natural life, and the remainder, after the death of the widow, to the lineal descendant or descendants of the son, and with the further exception that the deeds to John J. and Zachariah provided that the yearly rental to be paid by each should be $600, and the deed to George provided for a yearly rental of $500 and contained a reservation by the grantor of the right to use and occupy, for the period of his natural life, the old family home dwelling house and all lots and garden plots adjoining and appurtenant thereto.

After the deeds were executed the attorney who had drawn them advised John B. Martin to place the deeds in a bank, with directions to the bank to deliver them to the respective grantees after the death of Martin, and the attorney inclosed the deeds in an envelope, sealed the same and indorsed thereon the following:

"These deeds are placed in escrow by the undersigned with the German-American National Bank of Lincoln, Illinois, with directions to said bank to safely keep until my death and then deliver the several deeds herein to the several grantees named therein, if living, or to the remainder-men in each case entitled, if said grantees, or any of them, be dead.

"Dated this 3d day of May, A. D., 1912."

To this indorsement John B. Martin subscribed his name. Shortly thereafter the attorney took these deeds, inclosed in the sealed envelope with the above indorsement

on the outside of the envelope, to the German-American National Bank of Lincoln, Illinois, and gave the same to the cashier of the bank, at the same time stating that they could not be withdrawn. The cashier wrote the words "can not be withdrawn," in red ink, upon the outside of the envelope and placed the package in a box in the bank where customers' papers were kept, and it there remained until removed therefrom by the cashier as hereinafter stated.

At the time these deeds were executed certain promissory notes executed by John B. Martin were outstanding, viz., two notes for the aggregate principal sum of $695 signed by John B. Martin alone, payable to Kahn Bros.; five notes for the aggregate principal sum of $4100 signed by Zachariah and John B. Martin, payable to Kahn Bros.; three notes for the aggregate principal sum of $2600 signed by John J. Martin and John B. Martin, payable to Kahn Bros.; two notes for the aggregate principal sum of $4925.25 signed by George and John B. Martin, payable to the Lincoln State Bank; and one note for the principal sum of $5000 signed by John B. Martin alone, payable to George Martin and held by the Lincoln State Bank, the same having been negotiated at the bank by George Martin. All of these notes, except the two notes payable to Kahn Bros. for the aggregate principal sum of $695 and the note for $5000 payable to George Martin, were notes which John B. Martin had signed as surety for his sons. The note for $5000 was given to George Martin by John B. Martin on April 2, 1912, in order to obtain funds at the bank for John B. Martin and his sons George and Zachariah. From the proceeds of that note, obtained at the Lincoln State Bank, John B. Martin received $1000, George Martin received $1500 and George and Zachariah, jointly, received $2500. All of the notes above mentioned were subsequently paid except the two notes for the aggregate principal sum of $695 signed by John B. Martin alone, payable to Kahn Bros., and the five notes for the aggregate principal sum of $4100 signed by Zachariah and John B. Martin, payable to Kahn Bros.

At the time the deeds were executed John B. Martin was the owner of 36 acres of land, of the value of about $2600, which was not included in any of the deeds. He also had on deposit with the Lincoln State Bank $916, and held a mortgage on 20 acres of land belonging to George Martin to secure the payment of $2500. At the same time Zachariah Martin owned 71 acres of land, valued at $250 per acre, and personal property valued at several thousand dollars, and George owned 20 acres of land, valued at $250 per acre, subject to the mortgage held by his father to secure the payment of $2500, and also owned several thousand dollars' worth of personal property.

Beginning November 2, 1912, and continuing until the fall of 1915, John B. Martin signed numerous notes as surety for his son George and some notes as surety for his son Zachariah. Some of these notes made from time to time were renewal notes, but the majority were for original loans obtained by George Martin through brokers, upon the credit of John B. Martin. Some of these loans were made by the German-American National Bank of Lincoln to George Martin without the intervention of any broker. Two loans for $3000 each had been made to George Martin by A. D. Cadwallader, an attorney of Lincoln, on behalf of certain clients and on the credit of John B. Martin. During the latter part of September, 1915, the fact was brought to the attention of Cadwallader that John B. Martin had conveyed his lands to his children and that the deeds had been left with the German-American National Bank. Cadwallader went to the bank, told the cashier what he had heard and asked whether it was true. According to the testimony of the cashier he told Cadwallader that he could give him no information upon the subject. According to the testimony of the president of the bank, Cadwallader informed them that he intended to take judgment on the notes held by him for his clients; that the cashier then removed the package from the box in which it had been placed when it was left at the bank and showed him and

Cadwallader the indorsement on the envelope; that he (the president of the bank) called a meeting of the directors of the bank, submitted the matter to them, and it was decided to take judgment upon the notes held by the bank. Thereafter, during the month of October, 1915, judgments were obtained against John B. Martin for the total sum of $44,-118.53 on judgment notes which he had signed as surety for his son George; for the total sum of $14,583.20 on judgment notes which he had signed as surety for his son Zachariah, including $4798.95 on account of the notes given to Kahn Bros. above mentioned; and for the total sum of $3035.45 on account of the notes above mentioned given to Kahn Bros. which he had signed as surety for his son John J. The judgments obtained on notes signed by John B. Martin as surety for his son John J. have been paid and satisfied. In addition, judgments were obtained on notes signed by George and Zachariah for $1675.95, on notes signed by George alone for $3002.32, and on notes signed by Zachariah alone for $2192.59. Judgment was also obtained against John B. Martin alone for $819.61 on his individual notes held by Kahn Bros., as above stated.

The German-American National Bank was among the first to obtain judgments. As soon as judgments had been obtained upon the notes held by the bank the officers of the bank notified George and Zachariah Martin of its action and arranged a meeting at the bank with the members of the Martin family. Shortly afterwards John B. Martin and all of his children met at the bank, the attorney who had drawn the deeds was summoned, and the attorney, with the consent of all present, opened the envelope containing the deeds and read one of the deeds aloud.

Executions were issued upon the various judgments and placed in the hands of the sheriff. George, Zachariah and John B. Martin, respectively, delivered to the sheriff schedules of their personal property. The schedules made by George and Zachariah disclosed that each was the owner of several thousand dollars' worth of personal property. The

schedule made by John B. Martin showed he was the owner of personal property of the value of only $380. The sheriff did not levy upon the personal property of either George or Zachariah but the executions were returned unsatisfied by order of the plaintiffs' attorneys. Alias executions were thereafter issued, and on November 4, 1915, the German-American National Bank filed its bill of complaint in the circuit court of Logan county seeking to set aside the deeds from John B. Martin to his children in order to subject the lands therein described to executions issued or to be issued upon the judgments obtained by the bank against John B. Martin. The bill, in substance, charged that the deeds were never legally delivered to the grantees and that therefore no title ever passed to or vested in the grantees; that the deeds were not to take effect until the death of the grantor and were therefore testamentary in character and for that reason null and void; that the grantor retained a secret use of the property, which rendered the deeds void, and that the deeds were made by John B. Martin to defraud, hinder and delay his existing and subsequent creditors in the collection of their debts and were therefore void as to all creditors. John B. Martin and his children and their living descendants, and the wives of the sons and the husbands of the daughters, as well as all judgment creditors of John B. Martin, were made defendants to the bill.

John B. Martin, his son John J. and his four daughters joined in an answer, denying the averments of the bill concerning the alleged failure of delivery of the deeds, and denying that the deeds were testamentary in character or that a secret use was reserved by the grantor or that the deeds were made to defraud, hinder and delay creditors. The answer admits that the deeds were never recorded, but alleges that some of the grantees were in possession of the lands deeded to them, respectively, at and prior to the execution of the deeds; that the deeds were executed by John B. Martin in order to effect a voluntary settlement of his property among his children; that as to the grantees who

were in possession of the lands deeded to them when the deeds were executed, possession was taken and held under a promise made by John B. Martin to convey said lands to them, and that such grantees thereafter expended large sums of money in improvements on the lands deeded to them, respectively; that as to the grantees who were not in actual possession of the lands conveyed to them, two of them were minors at the time the deeds were executed; and that all of the judgment creditors of John B. Martin had constructive notice of the existence of said deeds and of the rights of the grantees therein at the time their debts were created. Zachariah Martin, represented by the attorney who had drawn the deeds in question for John B. Martin, filed a separate answer to the bill, in substance denying that the deeds were executed with the intent to hinder and delay creditors, but admitting the charge made in the bill that John B. Martin did not intend to immediately part with the title to the lands but intended that the deeds should not take effect until his death. George Martin did not answer the bill and was defaulted. The various judgment creditors of John B. Martin filed answers admitting the averments of the bill and joining in the prayer that the deeds be canceled and set aside as against creditors of John B. Martin. They also joined in a cross-bill, setting up their judgments and attacking the validity of the deeds upon substantially the same grounds as the original bill, and praying that the deeds be set aside and that the assets of the judgment debtors be marshaled under the direction of the court and sold and the proceeds applied to the payment of the judgments. John B. Martin, his son John and his four daughters answered the cross-bill, making substantially the same averments as were made in their answer to the original bill.

The cause was referred to the master to take the evidence and report the same to the court. From the evidence taken before the master the court found that the deeds from John B. Martin to his children were in fact and in law fraudulent and void as against the rights of his creditors

who are parties to the suit, and ordered and decreed that they be set aside, vacated and declared null and void and of no effect as against such creditors. From that decree John B. Martin, John J. Martin, Lillie E. Russell, Violet B. Malerich, Isa Marie Wigginton, Marian D. Martin, and certain infant grandchildren of John B. Martin by their guardians *ad litem,* have prosecuted this appeal.

In addition to the facts above stated the following appear from the evidence taken before the master: Several years prior to the execution of the deeds John B. Martin had placed his son Zachariah in possession of the 80 acres of farming land deeded to him, which adjoined the 71-acre tract owned by Zachariah, and his son John J. in possession of the 80 acres of farming land deeded to him, under an oral promise made to each that he would give those lands to them, respectively. Relying upon this promise Zachariah expended, as he testified, between $9000 and $10,000 in improvements upon the 80 acres deeded to him, and John J. expended, as he testified, between $1500 and $1800 in improvements upon the 80 acres deeded to him. Each had paid, and was paying, an annual rental to John B. Martin for the use of these lands as well as for the other lands farmed by them, respectively. By the deed to him George Martin was given what was known as the home place, the family residence being located on this tract. He was then living with his father, and was farming, with other lands belonging to John B. Martin, the home place, which his father had for several years told him would some day be given to him. In December, 1906, he purchased the 20-acre tract which he owned at the time the deeds were executed and which adjoined the home place. A few days after the execution of the deeds George Martin was married, and during the fall of 1912 built a house on the 80 acres which had been deeded to him and which constituted a part of the home place. He also, either during the same or the following fall, built a house on the 20-acre tract which he had purchased in 1906, and, together with his wife, has ever

since occupied the house on the 20-acre tract as his residence, the house on the 80-acre tract being referred to by him as his tenant house.

At the time the deeds in question were executed Lillie E. Martin was engaged to be married to Clyde Russell, and she was thereafter, on September 12, 1912, married to Russell. Before the marriage, and before the deeds were made, John B. Martin had promised both his daughter and Clyde Russell that he would give his daughter Lillie E. 80 acres of farming land, and had told Russell that he would deed the 80-acre tract to his daughter if Russell wanted to build on that tract. Immediately after the deeds were executed John B. Martin informed his daughter and Russell that he had made the deed and had left it at the bank, and told them the terms, conditions and limitations of the conveyance. At that time John J. Martin was farming this 80-acre tract. He immediately after the execution of the deeds gave up possession of that portion of the tract selected by Russell as a building site, and before his marriage Russell erected a house and other buildings thereon at a cost of $4300. Upon their marriage Russell and his wife moved into the house erected on the 80-acre tract deeded to Lillie E. and have lived there ever since. After harvesting the 1912 crops John J. Martin surrendered possession of the remainder of the 80 acres, and the same has since that time been occupied and farmed by Clyde Russell, who has paid to John B. Martin an annual rental of $400 therefor.

As hereinbefore stated, at the time the deeds in question were made the three sons, George, Zachariah and John J., were in possession, as tenants, of all the lands owned by their father. Thereafter, and up to the time of the filing of the bill of complaint herein, they continued in possession of all of the lands included in the deeds from John B. Martin to his children except the 80 acres deeded to Lillie E., which has been occupied by Clyde Russell and his wife since 1912. The other daughters of John B. Martin have never been in possession of any of the lands deeded to them and

have never paid their father any rent. The fact that John B. Martin had made deeds dividing his lands among his children became a matter of common knowledge among his neighbors and associates during the summer and fall of 1912, but this information was not brought directly to the attention of any of those who are now judgment creditors of John B. Martin.

The first note signed by John B. Martin after the execution of the deeds was on November 2, 1912. On that date George Martin applied to George Corwine, a money broker doing business in Lincoln, for a loan of $2000, stating that he would have his father sign the note as surety. Corwine asked George how much land his father owned, and George replied that his father owned 700 acres of unincumbered land in Logan county, and pointed out the land on an atlas of Logan county which Corwine had in his office and which showed the land in the name of John B. Martin. Corwine prepared a note for $2000, payable to Patrick Healy, and gave it to George, who thereafter returned it signed by himself and his father. Thereafter George obtained loans through Corwine aggregating $9800, for which he gave his notes signed by his father as surety, and on which he paid Corwine a commission of five per cent for obtaining the loans for him. These are part of the notes upon which judgments were obtained during October, 1915. Zachariah Martin also obtained one loan through Corwine for $1700, giving a note which his father signed with him as surety, and this note has not been paid. Corwine testified that after he had made the first four loans to George, and about March 1, 1914, John B. Martin came to his office with George; that he (Corwine) remarked to John B. Martin that the county atlas showed he·owned about 700 acres of land, and that John B. Martin replied that he owned more than 800 acres.

In February, 1914, George Martin applied to Matthew Reinhardt, another money broker doing business in Lincoln, for a loan of $10,000, representing that his father wanted

277 — 41

to borrow the money. Reinhardt had the records examined by an attorney, who reported to him that John B. Martin held the record title to more than 800 acres of land in Logan county, describing the lands. Reinhardt testified that he insisted upon having John B. Martin present at his office when the note was signed, and with the attorney's report before him remarked to John B. Martin, "I see according to the records you own something over 800 acres of land in this county," to which John B. Martin replied, "Yes, it is between 800 and 900 acres."

Both George and Zachariah Martin borrowed money from the Lincoln State Bank upon notes given by them, signed by their father as surety. The cashier of the bank testified that when making these loans he was assured by both George and Zachariah that their father owned between 800 and 900 acres of land, and that he had the records examined to verify these statements; that in June or July, 1915, when George Martin was asking for a renewal of his notes, the witness requested George to bring his father to the bank; that on this occasion John B. Martin and his sons George and John J. came to the bank, and that while the note was being signed he remarked to the boys, in the presence of their father, that he understood their father owned 800 or 900 acres of land, to which John J. Martin, in the presence of his father, replied, "Yes, father has plenty of property." The other loans to George and Zachariah Martin involved in this suit were also obtained upon the representation made by George and Zachariah that their father owned between 800 and 900 acres of land, and each of the judgment creditors testified that he or she had no notice or knowledge of the fact that John B. Martin had made deeds to his children at the time the loans were made, and that the loans were made upon the credit of John B. Martin, as the owner of the lands described in the deeds. The loans made by the German-American National Bank to George and Zachariah Martin upon notes signed by their father as surety, aggregating $8800, were all made after

the execution and delivery of the deeds to the cashier of
that bank, but the cashier and other officers of the bank tes-
tified that they had no knowledge of the existence of the
deeds or of the fact that John B. Martin had made deeds
conveying his lands to his children at the time the loans
were made.

The attorney who drew the deeds for John B. Martin,
when called as a witness by John B. Martin and those of his
children who joined with him in making a defense to the
bill and cross-bill, remembered none of the circumstances
surrounding the making and execution of the deeds.  He
was only able to remember that the deeds were drawn by
him and were executed by John B. Martin in his office.
John B. Martin testified that when he called upon the at-
torney he told him he wanted to make deeds to his children
and he wanted him to make them "good and solid;" that
he wanted a "lifetime dowry" in the land, and to give the
children a "lifetime dowry" and then to his grandchildren.
He further testified that he intended the deeds to take ef-
fect the minute he signed them, and that he so informed
his children as soon as he returned home; that the reason
the deeds were placed in the bank instead of being delivered
to the children was that the attorney advised him that was
the proper course to pursue; that when he signed most of
the notes as surety for George and Zachariah he was led to
believe that they were renewal notes, and that he never sup-
posed that he had become obligated for more than $20,000
until the judgments were taken against him and thought
that his sons had ample means to pay all the notes upon
which he had become liable as surety, and that at the time
he made the deeds to his children he had no intention of
hindering or delaying creditors in the collection of any notes
upon which he had become obligated.

George and Zachariah Martin were both called as wit-
nesses for the complainant and cross-complainants.  George
denied all knowledge of the making of the deeds, but the
facts and circumstances adduced upon his cross-examina-

tion and the testimony of various witnesses who testified to conversations had with him after the execution of the deeds show that his testimony denying knowledge of the making of the deeds is wholly unworthy of belief. Zachariah admitted that he was in the office of the attorney who drew the deeds shortly after they were signed and that the deed in which he was named as grantee was then shown him, but he says that he did not read the entire deed and did not learn what lands were conveyed to him. His testimony in this respect is also successfully impeached. It is apparent from the testimony and from their admissions upon cross-examination that both George and Zachariah were dissatisfied with the distribution of lands made by John B. Martin because the children were given only life estates and the daughters had been given equal shares with the sons.

The grounds relied upon by appellees in support of the decree of the circuit court are, (1) that the deeds in question were never legally delivered to the grantees or to anyone for them, and that the intention of the grantor was not to presently pass title to the grantees; (2) that the deeds were testamentary in character and therefore void; and (3) that the deeds were fraudulent in law and in fact as to the present and subsequent creditors of John B. Martin and are void as to them.

The question of delivery is almost wholly one of intention. As has been said many times, no particular form or ceremony is necessary to constitute a good delivery of a deed. It may be by acts without words or words without acts, or it may be by both words and acts. It is only necessary that the intention of the grantor be clearly manifested that the deed shall become operative immediately and that he surrender all control and dominion over it. In this State the law is well settled that where a grantor executes a deed and places it in the hands of a third party to be delivered unconditionally to the grantee upon the death of the grantor, and the grantor surrenders and releases all control and dominion over it, such acts constitute a valid de-

livery. It is just as well settled that such conveyances are not open to the objection that they are in the nature of testamentary dispositions and void unless executed with the formality required by the Statute of Wills. Such a deed takes effect, not at the time of the death of the grantor but immediately upon being delivered in escrow, if such act is attended with circumstances clearly evincing such intention on the part of the grantor. (*Bryan* v. *Wash,* 2 Gilm. 557; *Latimer* v. *Latimer,* 174 Ill. 418; *Thurston* v. *Tubbs,* 257 id. 465; *Sargent* v. *Roberts,* 265 id. 210; *Main* v. *Pratt,* 276 id. 218.) The reservation of a life estate in the grantor raises a strong presumption that it is intended that the title should vest immediately in the remainder-man, for the reason that if such intention had not existed there would be no reason for the reservation. (*Sargent* v. *Roberts, supra.*) In this case there can be no question whatever as to the intention of John B. Martin when he executed these deeds and caused them to be placed in the custody of the German-American National Bank. The execution of the deeds was the consummation of a plan which he had contemplated for some time, and it was his expressed intention that the deeds should become effective immediately. He imparted that desire and intention to the attorney employed to draft the deeds. It was not at his suggestion that the deeds were deposited with the bank. It was only when his attorney advised him that that was the proper and most appropriate way of carrying his plan into effect that he directed it be done. Had he received different advice for the carrying out of his plainly expressed intention this trouble and expense might have been avoided. As it was, the deeds were not delivered directly to the grantees in person and were not placed upon record, but John B. Martin parted with them unconditionally and irrevocably. He surrendered all dominion and control over them, and the bank held them thereafter, not as the agent of John B. Martin, but as the agent of the grantees named in the deeds and on their be-

half. It was never thereafter within the power of John B. Martin to recall the deeds or to alter them.

Appellees indulge in a long argument as to the effect of placing an instrument in escrow, but we do not deem it necessary to discuss this question.

The cases relied upon by appellees in support of their theory that a present delivery and an immediate vesting of the title were not effected are all cases where it was plainly the intention of the grantor that the title should not vest immediately but should vest at the time of the second delivery. That is not the situation here. Every fact and circumstance shown and every statement made by John B. Martin in connection with the execution and delivery of these deeds discloses in the most convincing manner that it was his intention and desire that title should vest in the grantees immediately. The deeds themselves provided that the grantees who were given life estates were entitled to the immediate possession of the lands conveyed to them, which possession they were entitled to retain as long as they paid to him the annuity provided for in their respective deeds.

A determination of the question whether the deeds were fraudulent in law and in fact as to the present and subsequent creditors of John B. Martin and void as to them is attended with more difficulty. At the time of the delivery of the deeds, on May 3, 1912, John B. Martin owed personally and upon his own account two notes in favor of Kahn Bros. aggregating $695. These were the only outstanding obligations of John B. Martin on that date. There was outstanding at that time a series of notes which John B. Martin had signed for the accommodation of his son Zachariah Martin in favor of Kahn Bros., the proceeds of which were used to purchase the 71-acre tract of land owned by Zachariah Martin. These notes are embraced in one judgment for $4798.95. The judgments on these notes and on the two individual notes of John B. Martin in favor of Kahn Bros. aggregate $5618.56, and represent the only in-

debtedness upon which John B. Martin was liable, individu-
ally or as surety for any of his sons, and which was in
existence May 3, 1912, and which has not since been paid
off. The aggregate of the indebtedness of John B. Martin,
both as principal and surety, on May 3, 1912, amounted to
$17,320.25, all of which has been paid except the judgments
aggregating $5618.56 above mentioned. On that date he
owned 36 acres of land not conveyed by these deeds, which
the proof shows was worth about $2600. He had on de-
posit in the Lincoln National Bank $916. He owned a mort-
gage on 20 acres belonging to George Martin, amounting to
$2500, making a total of assets worth $6016. In addition
to this he had reserved in the deeds a life estate or annuity
aggregating per annum the sum of $3500. Practically all
the indebtedness of John B. Martin on May 3, 1912, was
in notes which he had signed as surety for his sons. These
sons at that time each owned real estate in his own right
and each had considerable personal property. The proof
shows that on that date Zachariah owned an equity in real
estate of the value of $13,750 and owned about $7000 worth
of personal property, and that George Martin owned an
equity in real estate worth $2500 and about $3000 worth
of personal property, making a total of assets owned by
John B. Martin, Zachariah Martin and George Martin on
that date, exclusive of their interests in the real estate in
controversy, of $32,266. In addition, John B. Martin had
his life estate or annuity in the lands conveyed and Zacha-
riah and George each had a life estate in the lands con-
veyed to them. It will thus be seen that the estates retained
by John B. Martin upon the delivery of these deeds were
much in excess of his personal liability, and the joint es-
tates of John B. Martin, Zachariah Martin and George
Martin were very much in excess of their personal or joint
liabilities. The charge that the deeds were made to defraud
the existing creditors of John B. Martin is not sustained
by the proof.

Whether these deeds were void as to subsequent creditors depends wholly upon whether such subsequent creditors had actual or constructive notice of their execution or delivery. Section 30 of the Conveyance act provides that all deeds, mortgages and other instruments of writing which are authorized to be recorded shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers without notice, and that all such deeds shall be adjudged void as to all such creditors and subsequent purchasers without notice until the same shall be filed for record. This statute places creditors on the same footing as subsequent purchasers, and the question then is, would a subsequent purchaser have been held, under the facts in this case, to have received notice of the execution and delivery of these deeds? (*Hatch* v. *Bigelow,* 39 Ill. 546.) Each case is governed by its own particular facts. While it is sometimes difficult to determine what acts are sufficient to put a party on inquiry, there has never been any departure from the rule controlling the question as it was first stated in this State in *Doyle* v. *Teas,* 4 Scam. 202. The rule as there announced is as follows: "Where the court is satisfied that the subsequent purchaser acted in bad faith, and that he either had actual notice or might have had that notice had he not willfully or negligently shut his eyes against those lights which with proper observation would have led him to knowledge, he must suffer the consequences of his ignorance and be held to have had notice so as to taint this purchase with fraud in law. It is sufficient if the channels which would have led him to the truth were open before him, and his attention so directed that they would have been seen by a man of ordinary prudence and caution if he was liable to suffer the consequence of his ignorance. The law will not allow him to shut his eyes when his ignorance is to benefit himself at the expense of another, when he would have had them open and inquiring had the consequences of his ignorance been detrimental to himself and advantageous

to the other." This rule has been consistently followed, repeatedly re-affirmed and never departed from. Among the cases in which it has been followed and applied are *Rupert* v. *Mark,* 15 Ill. 540; *Merrick* v. *Wallace,* 19 id. 486; *Morrison* v. *Kelly,* 22 id. 609; *Hatch* v. *Bigelow, supra; Harper* v. *Ely,* 56 Ill. 179; *Babcock* v. *Lisk,* 57 id. 327; *Chicago, Rock Island and Pacific Railroad Co.* v. *Kennedy,* 70 id. 350; *Bent* v. *Coleman,* 89 id. 364; *Morrison* v. *Miles,* 270 id. 41. As a part of this rule this court has uniformly held that the actual occupation of land is equal to the record of the deed or other instrument under which the occupant claims; that the purchaser is bound to inquire by what right or title he holds, and that the open, visible possession of premises is sufficient to charge a purchaser with notice of all legal and equitable claims of the occupant. (*Coari* v. *Olsen,* 91 Ill. 273; *Dyer* v. *Martin,* 4 Scam. 146; *Brown* v. *Gaffney,* 28 Ill. 149; *Lumbard* v. *Abbey,* 73 id. 177; *Whitaker* v. *Miller,* 83 id. 381; *Haworth* v. *Taylor,* 108 id. 275; *Mallett* v. *Kaehlcr,* 141 id. 70; *Merchants' Bank* v. *Dawdy,* 230 id. 199.) Whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led, and every unusual circumstance is a ground of suspicion and prescribes inquiry. Whatever is sufficient to put a party upon inquiry which would lead to the truth is in all respects equal to and must be regarded as notice. One having notice of such facts as would put a prudent man on inquiry is chargeable with the knowledge of other facts which he might have discovered on diligent inquiry. (*Blake* v. *Blake,* 260 Ill. 70.) A purchaser may not excuse himself by merely obtaining information of the character in which the possession was originally obtained, but is bound to inquire of the person in possession by what tenure he holds possession and what interest he claims in the premises. *Williams* v. *Brown,* 14 Ill. 200.

By these deeds certain lands were conveyed to John J. Martin, Zachariah Martin and George Martin, respectively,

of which they were then in possession. Lillie E. Russell was the grantee of a life estate in 80 acres which was then in the possession of John J. Martin. Immediately after the deeds were executed and delivered John J. Martin delivered up possession of this 80-acre tract to his sister Lillie, and her affianced husband expended the sum of $4300 in the erection of a dwelling house and making other improvements upon it. Lillie was shortly thereafter married, and she and her husband have occupied this 80-acre tract and been in possession of it ever since and have paid to her father the sum of $400 per annum, the annuity reserved to be paid him in the deed to her. Of the land conveyed to John J. Martin, he was at that time in the possession of 80 acres thereof. Zachariah was in possession of 40 acres of this land and still retains possession of it as the tenant of John J. With the consent of his sister Violet, John J. Martin took possession of 20 acres of the land conveyed to her and has since remained in the possession of that tract, which joins his 80-acre tract. The girls, Violet B., Isa Marie and Marian D., were none of them in the actual possession of the property conveyed to them. With their consent their father leased the lands conveyed to them to the sons. While the father continued to reside in the homestead he was not in actual possession of any of the lands. The three sons had made more or less extensive improvements on the lands they received and the Russells had improved their 80-acre tract. The possession of John J., Zachariah, George and Lillie of separate tracts of this land was open, visible and notorious. None of the creditors made inquiry of any of the parties in possession as to the character of their possession. The only inquiry made in respect to the land is that testified to have been made of George and Zachariah at the time certain of these loans were made, and those inquiries were as to the extent of the holdings of their father. Applying the well settled rule as to constructive notice, it became the duty of these creditors to inquire of each of these children in possession by what right they held pos-

session of these lands.   An inquiry of Mrs. Russell or her husband would have elicited the fact that they were in possession of that land not as tenants, but by virtue of the deed which John B. Martin had executed and delivered to the German-American National Bank to be held for Mrs. Russell, and that pursuant to the provisions of that deed they were paying him an annuity of $400 per year, and that by reason of that conveyance they had made extensive improvements on the farm and had spent large sums of money in the erection of a dwelling and other buildings.   It may be said that it cannot be presumed that these facts would have been elicited in view of the fact that Mrs. Russell testified that her husband rented this land from her father. As we view it, Mrs. Russell was not characterizing their possession of this land but was simply describing how their business affairs were transacted and who had charge of attending to the matter of settling with John B. Martin.   The husband of Mrs. Russell, no doubt, as Mrs. Russell testified, paid to her father the amount reserved by him in his deed as an annuity.   She has always claimed the right to hold this land by virtue of the deed from her father, and as none of the creditors actually made any inquiry of her, it will be presumed now that had inquiry been made they would have been truthfully told all the facts relative to the interest which Mrs. Russell or her husband had in the land. Had the creditors inquired of John J. Martin they would have discovered that he, too, was in possession of 80 acres upon which he lived by virtue of a deed from his father, and that, relying upon an oral promise made to him by his father years before that this particular tract would be deeded to him, he had improved it to the extent of from $1500 to $1800.   They would have discovered from him, as from Mrs. Russell, the conditions of the deed, the fact that an annuity was reserved to the grantor, that the immediate grantee was given a life estate and the remainder in fee, as provided in the deed.   They would also have discovered that John J. Martin was in the possession of 20 acres

of this land which belonged to his sister Violet B., and which had been deeded to her by her father in the same manner that other lands had been deeded to John J. and Lillie E. Further inquiry would have elicited the fact that John B. Martin had conveyed all his land to his children except 36 acres. Having received this information, any prudent man would have at once gone to John B. Martin to ascertain how much, if any, of the land which he appeared to own of record he still possessed.

It seems impossible that anyone could have prosecuted an inquiry in good faith as to the rights claimed by the children in possession of the various tracts of this land without having discovered the terms and conditions of each deed made by John B. Martin and all the facts and circumstances surrounding its execution and delivery. It cannot be said that any creditor was relieved of the obligation of making these investigations because of statements made by John B. Martin at various times when loans were being made to his son George, for which he was signing as surety. John B. Martin denies that he told Corwine at his office, on March 1, 1914, that he owned more than 800 acres of land. He also denies that he stated to Reinhardt, in February, 1914, that he owned between 800 and 900 acres of land. Both John B. and John J. Martin deny the conversation the cashier of the Lincoln State Bank testified as having occurred in July, 1915, and in which John J. is represented as stating, in response to the suggestion of the cashier that he understood the father owned 800 or 900 acres of land, "Yes, father has plenty of property." Corwine, Reinhardt and the cashier of the Lincoln State Bank are rather feebly supported in these matters by the testimony of George Martin. The corroboration he gives is weak and unsatisfactory. Without regard to the fact that all the testimony of George Martin given in the case is utterly discredited, his attempted corroboration of these witnesses would carry but little weight. This leaves the testimony of John B. Martin standing alone against the testimony of Corwine and Rein-

hardt, and the testimony of John J. Martin and John B. Martin standing against the testimony of the cashier of the Lincoln State Bank.

John B. Martin never made any secret of the fact that he intended to make this division of his lands among his children or that he had made it. He talked about it freely with his neighbors and with his business associates. He told everyone with whom he talked about it that the deeds had been made and had been left with the German-American National Bank to be delivered to his children, and that each of his children now had a home. It was a matter of common discussion in the neighborhood in which the Martin family lived. It was generally known and discussed that Clyde Russell had erected the dwelling house upon the land that John B. Martin had deeded to his daughter Lillie. There is nothing in this record to indicate that John B. Martin is other than an honest, truthful and upright man. He has become involved in this trouble and litigation, not because of a desire to do anyone an injury, but as a result of having been poorly advised as to the correct method of procedure in making the conveyances he desired to make and in placing too much confidence in an unscrupulous son. There is no apparent reason why John B. Martin should have told everyone among his business and social associates, freely and without reserve, everything connected with or concerning the conveyances he had made to his children and then represent to these men that he still owned all these lands. It is possible these witnesses may have confused the conversations they testified they had with John B. Martin with statements made to them by George Martin. The chancellor did not hear the witnesses testify nor observe them while upon the witness stand. The evidence was taken before the master, who did not report his conclusions thereon. The chancellor had no better opportunity than we have to correctly weigh the evidence. We are of the opinion that John B. Martin did not state to any of his creditors that he still owned any of the lands in question and that

they were not misled by any statement made by him. In any event, John B. Martin was under no obligation to disclose the exact situation to the parties who were loaning money to his son, and he could not bind his children who had gone into possession of these lands under the deeds to them and had made valuable improvements thereon. Even if he had made the statements attributed to him by Corwine, Reinhardt and the cashier of the Lincoln State Bank, it would still have been incumbent upon the creditors to have inquired of the children in possession by what right they held possession, and what title, if any, they claimed to have to the land.

We have been unable to find any case where the facts were similar to those here disclosed. Usually no other lands are involved than those occupied by the person in possession. The channels which would have led these creditors to the truth, however, were open before them, and their attention was so directed by reason of the possession by various of the children of John B. Martin of the lands in question that they would have been seen by a man of ordinary prudence and caution. Any inquiry made of the children of John B. Martin who were in possession under the deeds would have revealed the whole situation, and would have advised those who are now creditors of the fact that John B. Martin had conveyed all of his real estate, except 36 acres, and had reserved to himself simply an annuity.

The German-American National Bank was given sufficient notice to put it upon inquiry when it accepted the deeds under the conditions upon which they were delivered to it. The deeds were not left at the bank merely for safe keeping, as counsel assume. They were left with the bank as the agent of the grantees named in the deeds, to be delivered to them, and to no one else, upon the death of John B. Martin. The bank had the option to refuse or to accept this responsibility. It chose to accept, and must be charged with full knowledge of the contents of the memorandum on the envelope which contained the instruments. This memo-

randum was sufficient to put any prudent man on inquiry who would have occasion thereafter to deal on the credit of John B. Martin. The bank shut its eyes against this light and made no inquiry to ascertain what conveyances had been made. It cannot now complain on the ground that it extended credit to John B. Martin on the faith of his ownership of these lands and without notice that he had conveyed them.

The court erred in setting aside the deeds. The creditors must be satisfied with and limited to the interest which John B. Martin retained in these lands, the life estates which were conveyed to Zachariah and George, and to the separate property owned individually by John B. Martin, Zachariah and George, respectively.

The decree of the circuit court is reversed and the cause is remanded, with directions to dismiss the bill for want of equity.   *Reversed and remanded, with directions.*

CARTWRIGHT, CARTER and DUNN, JJ., dissenting.