**0. C. Prideaux, Appellee, v. Mrs. Dee Miller and Addison W. Blank, Appellants.**

**Gen. No. 6,683.**

1. VENDOR AND PURCHASER, § 282*—*when right of vendor to declare contract null and void for nonpayment is waived.* The fact that a contract for the sale of real property provides that in case of failure of the purchaser to make any payment when due, the contract shall become null and void, and that there is a failure to make one of such payments, does not render the contract null and void where the parties thereto desire and agree that it shall remain in force.

2. VENDOR AND PURCHASER, § 199*—*when purchaser charged with notice of rights of third person.* An intending purchaser who, before entering into a contract for the purchase of real property, visited the premises, saw the sign of a third person thereon and knew that such person was in possession, is charged with notice of the existence of a contract whereunder such person had purchased the property, that large payments had been made thereon, that the right to forfeit such person's contract had been waived and different terms

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

of payment had been arranged and that he, the intending purchaser, cannot obtain the premises from the one offering to sell them to him, under whose contract such third person also holds.

3. Specific performance, § 3*—*relief as discretionary.* Specific performance of a contract will not be decreed as a matter of course, even though a legal contract be shown to exist, but rests in the sound judicial discretion of the court.

4. Specific performance, § 2*—*what circumstances warrant relief.* To warrant the court in compelling specific performance, the circumstances must be such that it would be unjust and against good conscience to refuse to compel it.

5. Specific performance, § 8*—*when specific performance of contract that cannot be performed should not be granted.* The court should, in the exercise of a sound judicial discretion, refuse to grant specific performance of a contract which could not be performed and which the person seeking the performance knew could not be performed when he filed his bill.

6. Specific performance, § 99*—*when court will not retain jurisdiction to assess damages.* Where specific performance is refused under a bill therefor, a court of equity will not retain jurisdiction to assess damages, as such assessment is a legal remedy only granted in equity when for some other and equitable reason the court has jurisdiction to render a decree in favor of the injured party.

7. Vendor and purchaser, § 2*—*when contract for sale of land already sold is not illegal.* That the real property which is the subject of a contract for sale has already been sold by the seller to another under a prior contract, does not render it illegal for the parties to enter into the second contract.

8. Specific performance, § 93*—*when defendant accorded equitable relief under cross-bill.* Where a decree of specific performance of a contract for the sale of realty is denied because the defendant had, prior to such contract, entered into a contract for the sale of the property to another who was in possession thereunder before the second contract was entered into, defendant, if entitled to equitable relief under her cross-bill seeking to have such contract of complainant set aside, will be accorded it only upon condition that she pays any damages to which complainant may be entitled.

9. Principal and agent, § 8*—*when evidence insufficient to show agency.* On a bill for specific performance of a contract for the sale of realty, evidence examined and *held* insufficient to show that the person by whom the sale was negotiated was acting as the agent of defendant.

10. Payment, § 11*—*when delivery of check to third person not payment to seller.* By delivering a check for the amount to a third

* See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

person who is not the seller's agent, the purchaser does not make a tender or payment of the amount required by the contract to be paid in advance.

11. SPECIFIC PERFORMANCE, § 91*—*when evidence warrants dismissal of cross-bill for want of equity.* On a bill to compel specific performance of a contract for the sale of realty in which defendant's answer stood as a cross-bill seeking cancellation of the contract, evidence examined and *held* to support a decree dismissing the cross-bill for want of equity.

Appeal from the City Court of Elgin; the Hon. FRANK E. SHOPEN, Judge, presiding. Heard in this court at the April term, 1919. Affirmed in part, reversed in part and remanded with directions. Opinion filed October 24, 1919.

CHARLES B. HAZLEHURST and ERNEST C. LUTHER, for appellants.

JOSEPH M. MANLEY and R. H. KRAMER, for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

Mrs. Dee Miller owned real estate in Elgin, fronting on Fulton street and running through to Grove avenue. Her home was on the part fronting on Fulton street. There was a livery stable on the part fronting on Grove avenue. On May 11, 1915, she executed a contract with O. C. Prideaux by which she agreed to sell and convey to him by warranty deed the premises on Grove avenue for $7,000, and he agreed to pay her therefor $300 in cash, which their contract said she had received, but which in fact she had not received when she executed it, and to transfer to her seventeen shares of capital stock of the National Boiler Specialties Company, a corporation, of the par value of $100 each, which she agreed to receive in payment of $1,700 of the purchase price, and for the balance of $5,000 Prideaux was to give Mrs. Miller a mortgage on said real estate, due in 3 years.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Two days later Mrs. Miller refused to carry out the contract. On December 2, 1915, Prideaux began this suit by filing a bill in equity against Mrs. Miller for a specific performance of said contract. By an amendment, Allison W. Blank was also made a defendant. The defendants filed separate answers. Mrs. Miller made her amended answer, also a cross-bill praying for the cancellation of said contract. Evidence was heard in open court at intervals for something like a year, and there was a decree that the contract was valid and binding and that Mrs. Miller ought in equity to perform it, but that it would be impracticable to enforce a specific performance and that it was not advisable to enter a decree therefor, but that complainant was entitled to the sum of $500 damages and to a return of $300 paid on the contract, and to $50 interest, making $850, and he was awarded execution against Mrs. Miller therefor. Her cross-bill was dismissed for want of equity. The court decreed that when Mrs. Miller had paid said $850 and interest and costs, she should be relieved from further liability on said contract. Mrs. Miller and Blank appealed from said decree. They assigned joint errors, but afterwards by leave of court each assigned separate errors upon the record. Prideaux assigned cross-errors, claiming thereunder that he should have had a decree for specific performance.

Theretofore, on July 2, 1914, Mrs. Miller had entered into a contract with Allison W. Blank by which she agreed to convey to him the same livery stable property and he agreed to pay her therefor $1,000 in cash, $750 on January 2, 1915, $750 on July 2, 1915, and then to execute to her a mortgage for $5,000, making a total consideration of $7,500, besides interest. Blank immediately entered into possession of the premises and placed signs in large letters upon the building containing his name and showing that he

was a veterinary surgeon and dentist, and that he also had a dog and cat hospital on the premises. He has ever since remained in possession. Before Prideaux entered into the contract with Mrs. Miller, he visited the premises and looked them over, and knew that Blank was in possession. He did not go into the livery stable building or look for Blank, or inquire of him what his rights were. It is held in *German-American Nat. Bank of Lincoln v. Martin,* 277 Ill. 629, on pages 648 and 649, and in many other earlier Illinois cases, that the open visible possession of premises is sufficient to charge a purchaser with notice of all the legal and equitable claims of the occupant; that whatever is notice enough to excite attention and put a party on his guard and call for inquiry is notice of everything to which such inquiry might have led, and that such party is chargeable with the knowledge of other facts which he might have discovered on diligent inquiry; that the purchaser is bound to inquire of the person in possession by what tenure he holds possession and what interest he claims in the premises. Prideaux's counsel answer this by saying that the Blank contract had previously been forfeited by its own terms, and also had been forfeited by a notice by Mrs. Miller to Blank. The Blank contract contained this provision: "In case of nonpayment of any above named payments when due, then this contract becomes null and void, and all payments on the same to be forfeited." When January 2, 1915, arrived, Blank did not pay Mrs. Miller the $750 then due. Appellee contends that when that day passed without that payment being made, the contract was at an end. Mrs. Miller and Blank afterwards agreed to continue it in force and to make payments in a different manner, and we are of the opinion that they were not forced to have a forfeiture of this contract by that provision, if neither of them desired it. J. V. Mink, a real estate agent in Elgin who drew the Blank con-

tract, suggested to Mrs. Miller to declare a forfeiture of the contract, keep the $1,000 which she had been paid when the contract was made, and sell the premises to some one else. After January 2, 1915, had passed and the $750 had not been paid, Mrs. Miller caused Mink to prepare for her two copies of a notice of forfeiture, with a statement to Blank in the notice that if he remained in possession any longer he must pay $30 per month rent. These notices were not signed by Mrs. Miller. She went to Blank with the notices to talk to him about it. He begged for leniency and she decided not to forfeit the contract, and gave him permission to pay $30 each month thereafter upon the contract, and he did so, and has so continued down to the trial of this cause. Up to the date of the making of the Prideaux contract, Blank had only paid the $1,000 and $30 per month beginning in January, 1915, but the proofs show that afterwards in some months, after paying $30 at the beginning, he paid $75 more in the same month, and once $150. The Blank contract, therefore, has never been forfeited, and when Prideaux visited the premises, saw the sign, and knew that Blank was in possession, he was charged with notice of the existence of the Blank contract and that large payments had been made thereon and that the provision for forfeiture had been suspended and a different arrangement made for the payment of the contract price, and that he therefore could not obtain the premises from Mrs. Miller. He is in the same position as if he had made that inquiry before purchasing of Mrs. Miller and had learned those facts.

It is obvious that Mrs. Miller could not perform the Prideaux contract. That would have required her to give possession to Prideaux not later than May 25, 1915. That she was then and is now powerless to do, and Prideaux knew or had that which amounts to knowledge of that fact; and she could not give covenants of warranty of title in a deed without their being

immediately broken and subjecting herself to an action upon the covenants of warranty. There was a mortgage on the premises for $2,500, not due until the next year, and this contract furnished her no means with which to pay it, and she had no other means. Specific performance of a contract will not be decreed as a matter of course, even though a legal contract is shown to exist, but it is a matter resting in the sound judicial discretion of the court. *Farson v. Fogg,* 205 Ill. 326. The circumstances must be such that it would be unjust and against good conscience to refuse to compel the specific performance thereof. *Stubbings v. Durham,* 210 Ill. 542, on p. 549, where other cases are cited. Inasmuch as this contract could not be performed, and the purchaser so knew when he filed his bill, the court in the exercise of a sound judicial discretion should have refused performance. Where specific performance is refused under a bill filed for that purpose, a court of equity will not retain jurisdiction to assess the damages. *Mack v. McIntosh,* 181 Ill. 633, and cases cited on p. 642. The obvious reason is that the assessment of damages is a legal remedy, and will only be granted in equity when for some other and equitable reason the court has jurisdiction to render a decree in favor of the injured party. This does not mean that it was illegal for either Prideaux or Mrs. Miller to enter into such a contract. The seller has the entire life of the contract during which to procure the title he agrees to convey, and the buyer knows that fact. We discussed that rule in *Augsberg v. Meredith,* 101 Ill. App. 629, and in *Thompson v. Hoppert,* 120 Ill. App. 588, and cited many cases to that effect. What we here hold is that as Mrs. Miller cannot perform this contract because of the prior rights of Blank, and as Prideaux knew that when he filed this bill, equity will not take jurisdiction, and therefore will not assess the damages. *Sellers v. Greer,* 172 Ill. 549, and cases

above cited. If this were all of the case the court should have dismissed the original bill without the assessment of damages; but Mrs. Miller made her amended answer also a cross-bill to have the Prideaux contract set aside, and if she was entitled to equitable relief under that cross-bill it would only be upon condition that she pay the damages, if any, which Prideaux might be entitled to. It therefore becomes necessary to further inquire into the merits of this case.

The court below found that Mink was the agent of Mrs. Miller in the making of the contract with Prideaux, and this is denied by appellants, and is somewhat material. Mink had sometimes done business for Mrs. Miller. He was a real estate agent and had been for very many years. The McGill Auto Company had been trying to buy this Grove avenue property from Mrs. Miller, and on May 8, 1915, it addressed to one G. W. L. Brown, who seems to have been acting for Mrs. Miller in that matter, a written proposition embodying an oral proposition made several days before, by which the company offered to buy this Grove avenue property for $4,000 cash and 25 shares of the capital stock of the National Boiler Specialties Company. Mrs. Miller then went to Mink and told him of this offer (although she seems to have incorrectly stated to him the number of shares), and she asked Mink what he thought this stock was worth. The reply which he made is in dispute. Earle Kelley, a brother-in-law of Mink, was seated in Mink's office operating a typewriter when Mrs. Miller made this inquiry of Mink. He testified that Mink asked him if there was such a corporation and that he said there was, and told the names of some who were interested in it, and that Mrs. Miller then asked him what he thought of the stock. This Mrs. Miller denies. Mrs. Miller went away. After she went away Kelley told Mink that Prideaux had some of this stock. Prideaux was then an officer of the corporation. Kelley had

been such an officer. He knew that Prideaux had some stock in that company. There is no testimony indicating that either Mink or Kelley knew that Prideaux, a dentist, had any desire to buy a livery stable, but it can be read between the lines of the testimony that they knew or suspected that he wished to get rid of the seventeen shares of said stock which he owned. Within a very short time thereafter Mink went to Prideaux and got from him an offer to be given to Mrs. Miller to pay $7,000 for this property, $300 in cash, $1,700 in said capital stock, and $5,000 in 3 years, secured by a mortgage on the premises. Within 20 or 30 minutes Mink had communicated this offer to Mrs. Miller, and afterwards they had a conversation about it, and Mink drew duplicate copies of a contract to that effect, and she signed the contracts. Prideaux took them to his lawyer, who drew another contract in duplicate, being the contract upon which this bill was based, and Mink procured their signature by Mrs. Miller and by Prideaux. Prideaux then sent a check to Mink payable to the order of Mink for $300. Mink thereupon cashed that check, paid Kelley $100, and sent his own personal check to Mrs. Miller for $200. Mrs. Miller immediately returned that check to Mink and refused to receive it. Mink then drew his own personal check to Mrs. Miller for $300 and sent it to her and she immediately returned it. Some considerable time afterwards Prideaux went to her twice to offer her a mortgage and a $5,000 note, which he had not signed, and certificates for the shares of stock. Each time she refused to receive them. These transactions were conducted so rapidly that from the time that the McGill Auto Company submitted its written proposition to Brown for Mrs. Miller until the time the second set of contracts with Prideaux was signed was only 3 days. Mink testified that he supposed that he was acting for Mrs. Miller. Mrs. Miller denied that he was acting for her in any respect in connec-

tion with the Prideaux contract. Nothing had been said about Prideaux when she left Mink's office. She did not then or afterwards ask Mink to sell this property. It seems that Brown was then her agent trying to dispose of it. After Kelley told Mink certain things, Mink went to Prideaux and obtained this offer, and Kelley took Prideaux to the premises. Out of the first payment Mink paid Kelley $100 as commission, and he testifies that Mrs. Miller had agreed to that. He said nothing about any commission for himself. He has never, so far as the proofs show, asked Mrs. Miller for any compensation of any kind. It seems very improbable that a man engaged in the real estate business for 35 years should conclude a contract for the sale of real estate for $7,000 and never suggest to his client that she pay him for his services, while at the same time paying a commission to the agent who represented the opposite party out of his supposed client's funds. If the stock was worth par, the offer from McGill Auto Company was for $500 more than the Prideaux offer and was for cash in hand, except the stock. Mrs. Miller should also have been protected against the outstanding mortgage given by Mrs. Miller for $2,500 not yet matured. Mink did not seek to protect Mrs. Miller in these respects, nor as to the Blank contract. This he naturally would have done if he had been her agent. We therefore conclude that by the preponderance of the evidence in this record Mink was not the agent of Mrs. Miller for the sale of this real estate, and that his statements did not bind her. Whether Mink was agent for Prideaux, or was aiding Kelley as Prideaux's agent, or was acting as a mere volunteer in the hope that some compensation would eventually accrue to him from some source, we are unable to determine from the evidence. As Mink was not the agent of Mrs. Miller, the check delivered by Prideaux to Mink and payable to Mink was not a payment nor a tender to Mrs. Miller of the $300

which his contract required him to pay Mrs. Miller. As Mink and Kelley were neither of them agents for Mrs. Miller, and as the contract cannot be enforced, and as Prideaux knew that before he filed this bill, we conclude that Mrs. Miller should not be compelled in this action to·pay Prideaux the $100 Mink paid Kelley.

The amended answer of Mrs. Miller, made a cross-bill, alleged that Prideaux intentionally committed a fraud upon her; that said stock was worthless and he knew it when they made the contract, and that it has been worthless ever since; that he represented to Mrs. Miller that it was worth par; that she had no other means of information and relied upon said representations and was deceived thereby. She therein prayed that said contract be canceled.

The authorized capital stock of the National Boiler Specialties Company was $100,000, of which some $60,000 had been issued. It was doing business in Elgin in a small basement and had an office in another building, and did a small amount of manufacturing of some article, and had a small account outstanding and owed more than that amount. It owned one or more patents. Mrs. Miller testified that Mink told her that Prideaux said his stock was worth $1,700 but unless Mink was Prideaux's agent, that statement was not binding upon him. Mink testified that Prideaux told him the stock was worth $1,700, and that he told Mrs. Miller that Prideaux said so. Prideaux testified that he never told Mink or any one else that the stock was worth $1,700, but that what he said to Mink was that he would not put that stock in on that trade at less than $1,700. There was evidence tending to show that the stock was of little value. Part of this evidence was returns made by the president of the corporation to the tax assessor, and they probably were not competent as against Prideaux, and, if competent, were not very satisfactory evidence as to the actual market value of the stock. There was evidence of

sales of this stock at par and of sales in the preceding
year at more than par. Prideaux did not meet Mrs.
Miller until a considerable time after she had refused
to perform the contract, so that he did not and could
not make any statement directly to her as to the value
of the stock. Mrs. Miller, before she signed this con-
tract, made inquiries of some other people as to the
value of the stock, and, among others, made inquiry of
a banker. No doubt it was unwise of Mrs. Miller to
make this contract with Prideaux, both because of the
doubtful value of the stock, and because, if it was
valuable, the offer of the McGill Auto Company was
much more to her interest, and also because of the
outstanding Blank contract, and because of the out-
standing mortgage not yet due, and because the con-
tract with Prideaux furnished her no cash with which
she could pay the outstanding mortgage. In this con-
dition of the testimony we cannot say that the court
below should have canceled the Prideaux contract un-
der the prayer of the cross-bill.

The decree of the court is therefore affirmed so far
as it dismisses the cross-bill for want of equity, and
in all other respects it is reversed and the cause is
remanded to the court below with directions to enter
a decree dismissing the bill of complaint for want of
equity, Prideaux to pay three-fourths of the costs of
the court below and Mrs. Miller one-fourth. The
costs of this court will be adjudged in the same pro-
portion.

*Affirmed in part, reversed in part and remanded
with direction.*